CONSUMERS GAS UTILITY COMPANY

*v.*

CHARLES B. WRIGHT, *et al.*

(No. 9934)

Submitted September 23, 1947. Decided October 14, 1947.

*S. A. Powell,* for appellant.

*Harry E. Moats,* for appellees.

RILEY, JUDGE:

Consumers Gas Utility Company, a corporation, which had filed its bill of complaint in the Circuit Court of Ritchie County against Charles B. Wright and others, partners, doing business as Ranger Gas Company, prosecutes this appeal from a decree denying the relief prayed for, and dismissing the cause.

From the allegations of the bill it appears that at the time of the execution of the contract involved in this suit, plaintiff corporation, hereinafter referred to as "utility" was engaged in producing, purchasing and distributing natural gas for heat and light to a number of municipalities in Ritchie County, and to that end owned and operated a number of gas wells and purchased natural gas from individuals, and, in emergencies, from other public

utilities; that its plant consists of pipe lines, meters, regulators, connections, and other equipment, and that defendant, hereinafter referred to as the "company," the lessee in a lease for oil and gas on a tract of land owned by one Lena Carr, had a short time prior thereto completed a producing gas well on the leased property. The bill further alleges that the parties litigant had on September 6, 1945, entered into an agreement whereby the company, in consideration of covenants on the part of the utility, sold to the utility, and the latter bought and agreed to take, at fifteen cents a thousand cubic feet, for a period of five years, and as much longer thereafter as gas is produced in paying and marketable quantities from the lands "all the natural gas that may be produced" by the company "from well[s] now drilled and any and all wells hereafter drilled," the marketing thereof to begin upon execution and delivery of the contract.

Under the aforesaid contract, which is incorporated in the bill, the company was to furnish, construct and maintain all necessary gathering lines and fittings to connect any producing well on said lands to the meter, and to install all drips and devices to separate any fluids from the gas in the gathering lines necessary to deliver the gas in a dry and marketable condition. All gas was to be measured by orifice, proportional or positive meter or measuring devices of equal accuracy, and all meters and appurtenant fixtures and structures properly to protect the same were to be installed or erected by the utility at the well free of costs to the company, the location thereof to be selected by mutual agreement. Both parties were to have access to the meters; the utility was to read them and was to remove the gauge charts, etc. Provision was made for challenges as to the accuracy of the meters; and, further, the utility was to take gas nine months of each year, and so much longer as a market could be found therefor. The company agreed not to dispose of gas to any other company or person during the existence of said contract; and further that should it desire to surrender its lease prior to termination of its agreement with the utility, the latter

was to have the right to an assignment therefor. The utility was also given the right to shut in any well or wells and remove the meter and lines if production for a period of thirty days should fall below ten thousand cubic feet a day until such time as the company should, by additional wells or repair of old wells, bring production up to the specified standard.

The bill further alleges that as a result of the contract the utility purchased 14,117 feet of two-inch pipe line, and expended a considerable sum of money on labor, connections and fittings, for rights of way and overhead expenses in laying said line from the gas well to its nearest main distributing line; that a No. 4 Emco meter was installed on October 28, 1945, at a point on the line of the utility, mutually agreed upon by the parties, some three thousand feet from the well "and the gas from said well turned into plaintiff's said line"; that shortly prior to November 16, 1945, well No. 2 was completed; that this latter well was located near the utility's line and about nine hundred feet from well No. 1; and that on the last-mentioned date the gas from well No. 2 was turned into the line. It is further alleged that a "drip" was installed, but not buried, about half way between the two wells to care for well No. 1; that no drip was installed between well No. 2 and the meter; and that due to the company's failure to provide proper drips, moisture collected in the lines, so that on December 24, 1945, the meter froze.

The bill further charges that in January, 1946, due to failure of the meter to register properly, an adjustment was made, and the company was fully paid for the failure of the meter to register properly at the contract price; that on May 3, 1946, the utility was notified by representatives of the company that the gas would be shut off if certain conditions were not met; that on May 4, 1946, the utility found that the gas had actually been cut off from the line; that on an investigation on May 18, the meter was registering fast; that on May 24, 1946, the utility "found the gas shut in said wells and locked by padlocks"; that

the gas has not been turned into the lines since that date; that by reason of the failure to carry out and perform the said contract as hereinbefore pleaded, the utility was without a sufficient supply of gas to meet the requirements of its customers; and that the utility as a result thereof was required to purchase gas from the Hope Natural Gas Company at thirty-three cents a thousand cubic feet, in order to meet the regular requirements of its customers.

A number of letters, written on behalf of the utility by its attorney, seeking a settlement, are incorporated in the bill of complaint, with the further allegation that same were unavailing; and that as a result resort to the courts has become necessary. It is also alleged that an action at law for breach would be wholly inadequate.

The prayer of the bill of complaint is (1) for an injunction commanding the company "to forthwith turn the gas from its said wells into the" gas line of the utility, and that it be restrained and enjoined from again shutting in or turning off said gas, except as provided by the contract of September 6, 1945; (2) that the company be directed to specifically perform and carry out such contract according to its terms; (3) that the amount, if any, due and owing to the defendants for gas heretofore produced from their said wells and delivered to the plaintiff under said agreement, be ascertained and adjudicated, and, if necessary for that purpose, the cause be referred to a commissioner in chancery or to a special master commissioner; and (4) for general relief. An amended demurrer to the bill having been sustained, the plaintiff not desiring further to amend, the chancellor entered the decree complained of.

The circuit court in a written opinion, made a part of the record, formulates the issue, raised by defendant's demurrer, into the following question: "Does the contract pleaded impose a duty on the defendants to deliver all the gas that can be produced by their wells to the plaintiff or does the contract merely impose a duty upon the defendants to deliver to the plaintiff all the gas which the defendants wish to produce and market? The defendants

say that so long as the gas is shut in the wells, it is not 'produced.' The plaintiff says that as soon as the gas comes to the surface of the ground, it is 'produced'." And, in concluding, the Court observes: "The Court is unable to find any promise to produce gas in the contract, nor can it find justification for implying in law such a promise."

The company contends in this Court that the language of the contract to the effect that the utility agreed to take all the natural gas that "may be produced" should be interpreted literally and is controlling; that the company should either sell or confine the gas in the several wells referred to in the bill of complaint; and that so long as the company does not elect to "produce," it is not required to deliver. Production, the company alleges, includes rendering the gas marketable by the removal of moisture.

It is clear from the provisions of the contract that the parties contemplated sale of gas as it comes to the surface in the well or wells. In our opinion, the purpose of the contract is to supply the utility with all the gas which could be produced under the lease. To hold, as contended by the company, would be to render the contract meaningless and of no effect in so far as the utility is concerned. At the time of the execution of the agreement, the company had a producing well capable of supplying gas in marketable quantities. The utility to avail itself of such gas expended several thousand dollars for pipe and labor in order to make it possible to carry out its part of the agreement. The company, under its agreement, is required to install and maintain proper drips in order that moisture might properly be removed from the gas, and further to permit the gas in a dry state to flow into the lines of the utility. The company had agreed on a procedure whereby any meter difficulty could be corrected. Nothing in the agreement authorized it for any cause or reason to shut off the gas at the well, so as to prevent the marketing of the same. It had also agreed not to sell to any one else. The logical meaning of the phrase "that may be produced" merely recognizes the fluctuation in the volume of the gas from time to time during the life of

the contract. The company cannot say in the circumstances portrayed by this record that it could or could not deliver at will. This position finds strength in the fact that the contract expressly provides the conditions under which the utility "shall have the right to shut in said well or wells and remove said meter and lines."

But it may be contended that plaintiff has an adequate remedy at law. In *Ritter Lumber Co. v. Lowe*, 75 W. Va. 714, 84 S. E. 566, this Court held that an injunction will not be granted where the law provides a full, complete and adequate remedy. But the mere existence of a legal remedy is not sufficient ground for the refusal of relief by injunction. To merit such refusal the legal remedy must be as efficient as the relief in equity. *Buskirk* v. *Sanders*, 70 W. Va. 363, 73 S. E. 937. In the instant case plaintiff, if it had resorted to the law side of the court, could have obtained a money judgment upon the difference between the cost of the gas, if it was required to purchase on the open market and the contract price; but resort to a court of law would necessitate plaintiff's either waiting until the expiration of the contract before instituting an action, or being required to institute two or more actions. So it seems to us that the legal remedy in the instant cause would not be as efficient as that which plaintiff here seeks.

For the foregoing reasons we reverse the decree of the circuit court and remand this cause to that court for further proceedings consonant with the principles herein set forth.

*Reversed and remanded.*